1

O/JS-6

2

3

4

5

6

7

8                    UNITED  STATES  DISTRICT  COURT

9              FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

10

11   SOUHAIR KHATIB,                    )        CASE NO. SACV 07-1012 DOC
                                        )        (MLGx)
12              Plaintiff(s),           )
                                        )
13        v.                            )        O R D E R GRANTING IN PART
                                        )        AND DENYING IN PART
14   COUNTY OF ORANGE, a political      )        DEFENDANTS' MOTION TO
     subdivision; MICHAEL S. CARONA,    )        DISMISS
15   an individual; BRIAN COSSAIRT, an  )
     individual; and DOES 1 through 10, )
16                                      )
                Defendant(s).           )
17                                      )
                                        )
18                                      )
                                        )
19   _____   )

20

21        Before the Court is Defendants County of Orange (the "County"), Michael S. Carona

22   ("Carona"), and Brian Cossairt's ("Cossairt") (collectively "Defendants") Motion to Dismiss

23   Plaintiff's First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the

24   "Motion").  The Court finds the matter appropriate for decision without oral argument.  Fed. R.

25   Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for January 14, 2008 was removed

26   from the Court's calendar.  After considering the moving, opposing, and replying papers, the

27   Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion.

28

1    **I.**     **BACKGROUND**

2         Plaintiff, Souhair Khatib ("Plaintiff"), has practiced the Islamic faith since birth.  Her

3 religious beliefs compel her to wear a hijab (a traditional headscarf) whenever she is in the

4 company of men who are not members of her immediate family.  Whenever Plaintiff is in public,

5 she covers her hair and neck with a hijab.  Appearing in the presence of male non-family

6 members without a hijab "is a serious breach of faith and a deeply humiliating and defiling

7 experience."

8         In 2006 Plaintiff and her husband pled guilty to a misdemeanor in the Orange County

9 Superior Court.  They were then placed on three years probation and ordered to complete thirty-

10 days of community service by November 3, 2006.  On November 1, 2006 Plaintiff appeared in

11 the Orange County Superior Court to seek an extension of time to complete her community

12 service.  Instead, the court revoked Plaintiff's and her husband's probation and had them taken

13 into custody.   A male officer then handcuffed and led Plaintiff to a courthouse holding facility.

14         When Plaintiff arrived at the holding facility's booking counter, a male officer ordered

15 Plaintiff to hand over her belongings and remove her hijab.  Plaintiff refused.  The officer

16 repeated the order.  Plaintiff again refused.  Another male officer also told Plaintiff to remove

17 her hijab.  Plaintiff again refused.  A female officer then told Plaintiff to remove the hijab.

18 Plaintiff again refused.  The female officer then told Plaintiff that the headscarf, which could be

19 used as a choking weapon against Plaintiff, had to be removed for Plaintiff's own security.  The

20 female officer also stated that, if Plaintiff did not remove the headscarf voluntarily, the male

21 officers would remove it.  To avoid being touched by the male officers, Plaintiff assented and

22 removed her hijab, revealing a long elastic band which held her hair back.  She was not required

23 to remove this elastic band.

24         After she removed the hijab, officers placed Plaintiff in a women's holding cell.  This cell

25 shared an open hallway with the male holding cell and was directly across from the booking

26 counter.  Guards and inmates at the booking counter and those using the hallway saw Plaintiff

27 while she waited in the holding cell.  This prompted Plaintiff to attempt to use a vest she was

28 wearing to cover her head and neck.

1    While inside the holding cell, Plaintiff saw another inmate, apparently in a Halloween

2    costume, wearing fishnet stockings.  She also saw a female inmate wearing a "waist-length

3    jacket over her clothing despite its potential use as a (choking) weapon."

4    That afternoon, Plaintiff was directed to return to the courtroom.  Upon exiting the cell,

5    an officer ordered her to remove the vest from her head and neck, which Plaintiff did.  Prior to

6    entering the courtroom, Plaintiff asked an officer if she could cover her head and neck with the

7    vest.  The officer declined.  Additionally, Plaintiff's husband asked an officer if Plaintiff could

8    cover her head and neck with his jacket.  The officer also declined this request.  When Plaintiff

9    entered the courtroom, she observed male members of her mosque, who were present to offer

10   assistance to Plaintiff and her husband.  Seeing these men from her mosque caused Plaintiff to

11   "feel[] humiliated and ashamed to be seen without her hijab."

12   During this appearance, the court ordered Plaintiff and her husband to complete thirty

13   days of community service by January 30, 2007.  Plaintiff then returned to the holding cell and

14   again used the vest to cover her head and neck.  At 4:00 or 4:30 that afternoon Plaintiff was

15   released from the holding cell.  She retrieved her belongings and asked if she could "step into an

16   adjoining room" to put on her headscarf.  Officers told her to wait until she left the holding area

17   to open the bag containing her belongings.

18   **II.    LEGAL STANDARD**

19   Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a

20   plaintiff's allegations fail to state a claim upon which relief can be granted.  Once it has

21   adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of

22   facts consistent with those allegations.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969

23   (2007); *see Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (stating that a

24   complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts

25   to support a cognizable legal theory).  Dismissal for failure to state a claim does not require the

26   appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim

27   that would entitle it to relief.  *Bell Atlantic*, 127 S. Ct. at 1968 (abrogating *Conley v. Gibson*, 355

28   U.S. 41, 45-46, 78 S. Ct. 99 (1957)).

3

1    The Court must accept as true all factual allegations in the complaint and must draw all

2    reasonable inferences from those allegations, construing the complaint in the light most

3    favorable to the plaintiff.  *Guerrero v. Gates*, 442 F.3d 697, 703 (9th Cir. 2006); *Balistreri*, 901

4    F.2d at 699.  Dismissal without leave to amend is appropriate only when the Court is satisfied

5    that the deficiencies in the complaint could not possibly be cured by amendment.  *Jackson v.*

6    *Carey*, 353 F.3d 750, 758 (9th Cir. 2003) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir.

7    1996)); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

8    **III.    DISCUSSION**

9            **A.    Standing to Seek Equitable Relief**

10           A plaintiff seeking equitable relief against government action must show that "she has

11   sustained or is immediately in danger of sustaining some direct injury" as a result of the official

12   conduct.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660 (1968).  The injury or

13   threat of injury must be "real and immediate" rather than "conjectural."  *Id.*  Moreover, "[p]ast

14   exposure to illegal conduct does not in itself show a present case or controversy regarding

15   injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  *O'Shea v.*

16   *Littleton*, 414 U.S. 488, 495-96, 94 S. Ct. 669, 676 (1974).  Instead, Plaintiff has standing to seek

17   equitable relief only if she is likely to be subjected to wrongful state action for completely

18   innocent conduct.  *Hodgers-Dugin v. de la Vina*, 199 F.3d 1037, 1041-44 (9th Cir. 1999).

19           Here, Plaintiff has not established that she is in real and immediate danger of being

20   compelled to remove her headscarf in the future.  Nor has she alleged that she may be subjected

21   to similar misconduct as a result of completely innocent conduct.  Her argument that she may be

22   taken into custody for such innocent conduct as failing to carry a her Driver's License or

23   Identification Card is unavailing.  The terms of Plaintiff's probation require her to carry

24   identification; her failure to abide by these terms is not "completely innocent."  While failure to

25   carry identification is typically not considered wrongful conduct, violation of the conditions of

26   one's probation is certainly wrongful.  Plaintiff's claim that she may again experience injury

27   rests on the purely conjectural possibility that she will again violate her probation and be taken

28   into custody.

4

1       Finally, although Plaintiff may suffer an ongoing emotional impact from the incident at

2 issue, this is inadequate to grant standing absent a "real and immediate threat of future injury. .

3 .." *Lyons*, 461 U.S. at 107 n. 8 (1968).  Plaintiff has not sufficiently alleged any such threat.

4 Accordingly, Plaintiff lacks standing to pursue equitable relief, and Defendants' Motion to

5 Dismiss on this ground is GRANTED with prejudice.

6       **B.      The Religious Land Use and Institutionalized Persons Act of 2000**

7       The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), provides

8 that:

9           No government shall impose a substantial burden on the religious
exercise of a person residing in or confined to an institution, as
10           defined in [the Prison Litigaton Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997], even if the burden results from a rule of general
11           applicability, unless the government demonstrates that the imposition
of the burden on that person [meets strict judicial scrutiny].

12 42 U.S.C. § 2000cc-1(a).  The PLRA defines an "institution" as "any facility or institution

13 owned, operated, or managed by, or [that] provides services on behalf of any State or political

14 subdivision of a State," and which is, *inter alia*, "a jail, prison, or other correctional facility," or

15 a "pretrial detention facility.  42 U.S.C. § 1997(1)(B)(ii) & (iii).

16       The central question in the instant case, apparently one of first impression, is whether a

17 courthouse holding facility is an institution for purposes of RLUIPA.  For the reasons that

18 follow, the Court finds such a holding facility cannot constitute an "institution."

19       Traditionally, RLUIPA has been applied to assure religious freedom within jails and

20 prisons.  These facilities hold inmates for substantial periods of time.  The relatively lengthy

21 period of confinement allows a sort of homeostasis to develop among the inmate population.

22 This modicum of stability allows for the increased religious freedoms contemplated by RLUIPA.

23 However, this same stability and relative safety is not present in courthouse holding facilities.

24 Accordingly, applying RLUIPA to such facilities seems misguided.

25       The relative safety and stability of longer-term facilities arise for a number of reasons.

26 First, the longer period of confinement permits staff and inmates to become familiar with one

27 another.  Guards that know inmates well are better attuned to warning signs of potential

28

1    disruption and can typically use this knowledge to avoid significant problems.  Additionally,

2    inmates and staff develop a sort of rapport, albeit less-than-friendly, through which neither group

3    frequently tests the boundaries of acceptable conduct.  A similar detente arises among prisoners

4    who, often grudgingly, avoid confrontation despite significant periods of unsupervised exposure

5    to one another.

6          This environment also requires staff members to identify and isolate dangerous or

7    vulnerable inmates, to ascertain which inmates or groups need additional supervision and which

8    can be trusted with less, and to separate groups of inmates that have the highest potential for

9    conflict. Within these facilities inmates are separated to keep tensions and violence to a

10   minimum.  Additionally, inmates are segregated according to the severity and/or violence of

11   their offenses – e.g., inmates convicted of fraud-based crimes are housed separately from

12   inmates convicted of armed robbery.  The ability to separate inmates helps maintain the overall

13   safety of the facility.

14         The proper functioning of jail or prison facilities also depends on the establishment and

15   strict adherence to a routine.  Inmates and guards develop a daily pattern, including counting

16   inmates, dining, work within the jail or prison, exercise, etc.  When both guards and inmates

17   know what is expected on a daily basis, the risk of disruption or violence decreases.  For the

18   most part, guards and inmates follow their daily routine without serious problems.

19         Finally, inmates within longer-term facilities are searched on entry and subsequently

20   searched with some regularity.  Accordingly, although not perfect, guards have the ability to

21   drastically reduce the number of dangerous items that inmates have in their possession.  The

22   assurance that inmates are largely unarmed aids in creating a relatively safe atmosphere within

23   jails and prisons.

24         The safety and stability inside longer-term facilities created by the factors discussed

25   above allows staff to pursue rehabilitative or corrective goals and also permits a fair amount of

26   expressive and religious freedom.  These are the sorts of facilities that Congress plainly had in

27   mind when it enacted RLUIPA, to allow "institutionalized persons to exercise their religion to

28   the extent that it does not undermine the security, discipline, and order of their institutions."  146

1   Cong. Rec. S6678-02 (daily ed. July 13, 2000) (Statement of Sen. Hatch).

2       However, Courthouse holding facilities are entirely different than longer-term facilities

3   such as jails and prisons.  The factors needed to create the atmosphere of stability inside jails and

4   prisons that allows for exercise of religious freedoms without "undermin[ing] . . . security,

5   discipline, and order . . ." are utterly absent from courthouse holding facilities.  Instead, in order

6   to assure that inmates and staff remain safe, guards must assure that all inmates are strictly

7   supervised and treated uniformly.  In dramatic contrast to the stability and routine of jails or

8   prisons, these facilities are in constant motion.  Indeed, the very purpose of courthouse holding

9   facilities is to process inmates and hold them for a period of hours to assure that they make court

10  appearances.  Within this period of hours, large numbers of inmates are taken into custody,

11  released from custody and taken to and from hearings within the courthouse.

12      In the early hours of the morning, long before judges take the bench to begin the days'

13  criminal calendar, inmates start to arrive at courthouse holding facilities.  These facilities,

14  generally beneath the portions of the courthouse open to the public, are forced to accept all

15  inmates from various jails and prisons throughout the county that are scheduled for hearings.

16  Naturally, this includes some of the most dangerous inmates.

17      Upon entering the courthouse facility, these inmates are taken to a labyrinthine series of

18  underground hallways beneath the courthouse.  Under the watchful eye of a severely limited

19  number of guards, they form lines for brief – often insufficient – searches.  After being searched,

20  they are taken to a processing counter and then placed in one of a number of holding cells, which

21  hold approximately 10 to 150 inmates at a time.  Despite numerous cameras monitoring these

22  holdings cells and the presence of guards nearby, killings (self-inflicted or otherwise) are not

23  infrequent.  Such incidents have made the physical safety of inmates a top priority of these

24  facilities.  Indeed, these short-term facilities are, for reasons identified below, some of the most

25  dangerous in the penal system.

26      At some point, inmates are removed from these holding facilities and taken to court in

27  shifts: black male inmates, Hispanic male inmates, Asian male inmates, white male inmates,

28  female inmates, transsexual inmates, and finally, inmates with communicable diseases.  This

7

1   unfortunate parade of inmates has developed as one of a limited number of practical ways to

2   reduce violence between groups.  Inmates are then placed in smaller cells within each courtroom

3   while they await their hearings.

4         During the day's proceedings, courts often take individuals into immediate custody.

5   These individuals, essentially taken directly off the street, are placed in the courtroom cells along

6   with inmates that were transferred from other penal facilities.  Aside from the metal detectors at

7   the entrance to the courthouse, individuals taken into custody in court have not been searched for

8   weapons or contraband.  However, at the close of the morning session, all of the inmates,

9   including these new additions, are returned to the underground holding facilities.  The inmates

10  are again searched, those taken into custody in court are processed and required to turn over

11  personal belongings, and all are placed back into the temporary holding cells.

12        After a brief lunch, the process begins again for the afternoon calendar.  At the end of the

13  day, those inmates ordered released will be given back their personal belongings and released

14  from custody.

15        This regular movement of inmates throughout the morning is made more difficult by

16  issues that require immediate attention.  Even during the relative "down time," where the

17  majority of inmates are in the appropriate places, judges may require specific defendants to

18  appear immediately, guards may have to transfer one or a small number of inmates between

19  holding cells, inmates may arrive from other facilities, etc.  Even in the brief periods of relative

20  calm throughout the day, there is always some action within these facilities.

21        The dissimilarity of "institutions" such as jails and prisons, and courthouse holding

22  facilities is apparent when the factors above, which lead to the relative stability in long-term

23  facilities, are considered.

24        Far from having daily interaction with inmates, guards have only a few minutes while

25  inmates are being processed or moved to gain whatever familiarity they can.  Once inmates are

26  in the holding cells, their interaction with guards is minimal.  Additionally, they are only in these

27  cells, under the supervision of courthouse personnel, for the few hours between hearings.  Rather

28  than seeing the same inmates every day, the courthouse holding facilities process a new group of

1   inmates every day.  There is no period in which inmates and staff can develop the sort of rapport

2   that exists in longer-term facilities.  Guards have no way of identifying warning signs for

3   dangerous conduct.

4       Likewise, there is little opportunity for staff to segregate inmates according to their

5   dangerousness or vulnerability.  Guards in courthouse holding facilities place inmates

6   haphazardly into holding cells largely dependent on their race or their preference to be held with

7   a particular racial group.  They are required to make snap judgements of where to place each

8   individual.  Due to their inability to separate predatory inmates from the weak or vulnerable, or

9   to separate violent offenders from other, less dangerous inmates, it is not unusual for a probation

10  violator to be housed in the same cell as a violent criminal.

11      As one might imagine from the constant movement within the holding facilities, there is

12  also no opportunity for inmates to develop a routine.  They are in and out of the facilities before

13  any such routine could develop.  Instead, safety in courthouse holding facilities relies on strict

14  control by guards.

15      Finally, because a number of individuals are taken into custody from court, the

16  opportunity for a full search is limited.  Accordingly, the assumption that prisoners are unarmed

17  does not hold true in the courthouse holding facilities.  Additionally, due to limited space,

18  individuals taken into custody in court are placed in the same cells as those who came from jails

19  and prisons.  Accordingly, there is a heightened risk that dangerous objects will be used by

20  individuals who would not otherwise have access to them.  For this reason, guards are

21  particularly sensitive to allowing inmates to keep personal items which may be used as weapons.

22      In order to assure the safety of inmates as well as staff, guards in courthouse holding

23  facilities, who are unable to develop a routine with inmates, must exercise strict control.  The

24  level of supervision and control at a courthouse holding facility is necessarily greater than at a

25  longer-term facility because guards do not have the luxury of being familiar with inmates or

26  getting inmates into a pattern of behavior.  The cost of this strict control, needed to assure that

27  inmates and staff are safe, is a uniformity of treatment that may not always be consistent with the

28  exercise of individual religious and expressive freedoms.  Indeed, in order to maintain this strict

9

1  control, guards must make split-second decisions about how to handle situations as they arise,

2  and must assure that inmates fully comply with their directives.  These decisions include where

3  to place certain inmates or groups, how to order movements of inmates from the cells, which

4  inmates need to be searched more carefully, and how to deal with inmates taken into custody in

5  court.   This multitude of micro-level decisions, made within a matter of seconds, is not

6  amenable to *post hoc* judicial review as contemplated by RLUIPA.

7       Courthouse holding facilities are not "places of correction or detention." *See Witzke v.*

8  *Femal*, 376 F.3d 744, 753 (7th Cir. 2004) (quoting *Alexander S. v. Boyd*, 113 F.3d 1373, 1383

9  (4th Cir. 1997)).  They serve no correctional or rehabilitative purpose, and individuals are not

10  detained in them for material periods.  Instead, they serve only to assure that inmates are taken to

11  and from court as scheduled. Individuals temporarily placed in these facilities are simply not the

12  sort of "institutionalized persons who are . . . dependent on the government's permission or

13  accommodation for exercise of their religion."  *See Cutter v. Wilkinson*, 544 U.S. 709, 721, 125

14  S. Ct. 2113 (2005).  Instead, if these individuals are "institutionalized," it is by the longer-term

15  facilities that typically house them, not by the short term processing facilities that comprise

16  courthouse holding areas.

17       Instructive is the fact that courthouse holding facilities lack the administrative grievance

18  procedure dictated by PLRA.  Although Congress clearly intended "a wide variety of institutions

19  to be afforded the opportunity to address the problems presented in inmate complaints before the

20  initiation of a federal lawsuit," *Wtizke*, *supra* (citing *Porter v. Nussle*, 534 U.S. 516, 524-25, 122

21  S. Ct. 983 (2002)), case law has not extended the PLRA's protections to courthouse holding

22  facilities.

23       The fact that PLRA's requirements have not been applied to such facilities deprives them

24  of the protection afforded to jails and prisons.  These protections were plainly relevant in the

25  choice to define the scope of RLUIPA by reference to the PLRA.  In discussing RLUIPA,

26  Senator Kennedy discounted fears of frivolous prisoner suits as follows:

27         Congress also passed the [PLRA], which includes a number of
           procedural rules to limit frivolous prisoner litigation.  Those
28         procedural rules will apply in cases brought under the bill we are

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> introducing today.  Based upon these protections and the data on
> prison litigation, it is clear that this provision in our bill will not lead
> to a flood of frivolous lawsuits or threaten the safety, order, or
> discipline in correctional facilities.

146 Cong. Rec. S6678-02 (daily ed. July 13, 2000) (statement of Sen. Kennedy).  To apply

RLUIPA to courthouse holding facilities, where the requirements of PLRA are not clearly

applicable, would make frivolous religious litigation a real possibility.  It would give rise to the

exact harm contemplated and discounted by Senator Kennedy and disregard Congress' express

choice to define the scope of RLUIPA as it has.

    Indeed, courthouse holding facilities are distinct from the types of institutions Congress

could have had in mind when it laid out the requirements of the PLRA.  As the Supreme Court

noted in *Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983 (2002), Congress, in enacting the PLRA,

intended to "afford[ ] corrections officials *time and opportunity* to address complaints internally

before allowing the initiation of a federal case."  *Id.* at 524-25 (emphasis added).  No such

opportunity is afforded to officials operating courthouse holding facilities.  No such opportunity

*could* be afforded.  In the time needed to consider an administrative grievance, the inmate's stay

in the holding facility (generally for no more than a few hours) would have long ended.  The

procedures outlined by Congress in the PLRA would be entirely ineffective in this setting.  The

impracticality of applying the PLRA in courthouse holding facilities demonstrates that the broad

reach of the PLRA, and thus RLUIPA, does not stretch to such facilities.

    By way of comparison, courthouse holding facilities are more akin to the temporary

holding facilities at police stations held not to be governed by the PLRA, *see Linares v. Jones*,

04-0247, 2007 WL 1601725 at *4 (D.D.C.  June 4, 2007) (police station detention); *Berishaj v.*

*City of Warren*, 04-70998, 05-71476, 2006 WL 2069440 at *12  (E.D. Mich. 2006) (holding that

PLRA requirements do not apply to temporary detention at police facility because Plaintiffs

were no longer incarcerated at time of suit), than they are to halfway houses or drug treatment

facilities, where PLRA has been found to apply, *see Witzke*, *supra* (drug treatment facility);

*Ruggiero v. County of Orange*, 467 F.3d 170 (2d Cir. 2006) (halfway house).  Halfway houses

and drug treatment facilities epitomize the ability of longer-term facilities to use familiarity and

1  routine to assure safety.  At these institutions, which have minimal security in place, inmates are

2  reintegrated into everyday life and routine activities and given treatment rather than punishment.

3  The opposite is true of holding facilities: because they house inmates temporarily, they must rely

4  on extensive security and constant supervision to assure the safety of inmates and staff.   The

5  same temporary and transitory nature that makes holding facilities poor candidates for the

6  PLRA's administrative procedures, necessarily makes it unlikely that Congress intended them to

7  be covered by RLUIPA.

8       Simply put, an inmate's stay in a courthouse holding facility is generally temporary and

9  transitory.  For a number of reasons, constant movement within holding facilities makes

10  unlimited exercise of religious and expressive freedoms impractical.  Staff at such facilities do

11  not have the luxuries that make such freedoms feasible in longer-term institutions, to which

12  RLUIPA plainly applies.  As a result, the Court cannot conclude that Congress intended the

13  PLRA or RLUIPA to apply to courthouse facilities.

14       This holding does not imply that religious freedoms have no place in courthouse holding

15  facilities.  Indeed, as discussed *infra* at Section C, Plaintiff can certainly maintain a First

16  Amendment challenge to the practices of such facilities.  Instead, the Court merely finds that

17  Congress could not have intended for such facilities to be subject to strict judicial review under

18  RLUIPA where the robust exercise of religious freedoms in these facilities could, for the reasons

19  discussed above, place the safety of inmates and staff at serious risk.

20       Therefore, Defendants' Motion to Dismiss Plaintiff's RLUIPA claims is hereby

21  GRANTED.

22       **C.     Free Exercise**

23       Plaintiff alleges that the removal of her headscarf and refusal to allow her to wear it

24  during her court appearance or in the holding facility violated her First Amendment rights.  The

25  Civil Rights Act of 1871, 42 U.S.C. § 1983, provides a cause of action for violations of

26  constitutional guarantees.  To make out a claim under § 1983, a plaintiff must allege that a

27  person "acting under the color of state law," "deprived the plaintiff of a federal constitutional or

28  statutory right."  *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989) (citing *Rinker v. County*

1  *of Napa*, 831 F.3d 829, 831 (9th Cir. 1987)).

2  Plaintiff has clearly satisfied her burden of pleading state action.  She claims that officers

3  employed by the OCSD, following a County custom, practice or official policy, caused her to

4  remove the headscarf and refused to permit her to put it back on.  She alleges that this custom,

5  policy or practice was implemented by the OCSD, Defendant Carona and Defendant Cossairt

6  and/or ratified or not redressed by the County.

7  Plaintiff alleges that her First Amendment right to free exercise of her religion was

8  violated.  To prevail on such a claim, Plaintiff must establish that officials burdened a belief that

9  was sincerely held and rooted in religious beliefs.  *See Malik v. Brown*, 16 F.3d 330, 333 (9th

10  Cir. 1994) (citing *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981) (two criteria are

11  sincerity and basis in religion).   Secular or philosophical beliefs do not merit protection under

12  the Free Exercise clause. *Id.*  Additionally, the Court need not consider whether religious beliefs

13  are "central" to a persons faith, but merely whether they are sincerely held.  *See Employment*

14  *Div. v. Smith*, 494 U.S. 872, 886-887 ("[in]appropriate for judges to determine the 'centrality' of

15  religious beliefs . . ..");  *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008) (discussing

16  sincerity and centrality test).

17  Plaintiff has satisfied this "sincerity test" by alleging that having her head uncovered in

18  the presence of male non-family members "is a serious breach of faith and a deeply humiliating

19  and defiling experience."  Additionally, the allegation that male officers forced plaintiff to

20  remove the headscarf and refused to permit her to replace it either in the holding facility or in

21  court is sufficient to plead that the officers burdened or infringed Plaintiff's right.

22  Finally, to state a constitutional claim under § 1983, the plaintiff must allege harm and

23  causation – i.e. a specific injury as a result of the conduct of a particular defendant and an

24  affirmative link between injury and conduct.  *See Rizzo v. Goode*, 423 U.S. 362, 371-72, 77, 96

25  S. Ct. 598 (1976).   The allegations that individual OCSD employees were responsible for this

26  purported infringement, and that they acted pursuant to an official policy or custom, satisfies this

27  "affirmative link" requirement.

28  Because Plaintiff's allegations are sufficient to plead a § 1983 claim for a violation of the

13

1   Free Exercise Clause, Defendants' Motion to Dismiss this claim is DENIED.

2       **D.**      **Qualified Immunity**

3       Qualified Immunity applies to shield a state actor from liability where "she makes a

4 decision that, even if constitutionally deficient, reasonably misapprehends the law governing the

5 circumstances she confronted." *Brosseau v. Hagan*, 543 U.S. 194, 198, 125 S. Ct. 596 (2004).

6 A qualified immunity determination requires a two-tiered analysis. The court must first

7 determine whether the plaintiff has alleged a constitutional deprivation. *See Conn v. Gabbert*,

8 526 U.S. 286, 290 119 S. Ct. 1292 (1999) (citing *Siegert v. Gilley*, 500 U.S. 226, 232-233, 111

9 S. Ct. 1789 (1991); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5, 118 S. Ct. 1708

10 (1998)). As discussed *supra* at section C, Plaintiff has adequately alleged a violation of her First

11 Amendment rights.

12       Thus, the Court must consider the second stage of analysis: whether the right was clearly

13 established at the time of the alleged violation. *See id.* A right is "clearly established" if, "in

14 light of the specific context of the case," it would be "clear to a reasonable officer that his

15 conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02,

16 121 S. Ct. 2151 (2001).

17       "Rule 12(b)(6) dismissal is not appropriate unless [the Court] can determine, based on the

18 complaint itself, that qualified immunity applies." *Groten v. California*, 251 F.3d 844, 851 (9th

19 Cir. 2001) (citing *Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998)). However,

20 whether the constitutional right at issue was "clearly established . . . presents a question of law."

21 *Elder v. Holloway*, 510 U.S. 510, 516, 144 S. Ct. 1019 (1994). Accordingly, in cases where the

22 complaint itself discloses the basis for a valid qualified immunity defense, the Court may

23 consider that defense on a Motion to Dismiss.

24       The right at issue was Plaintiffs' purported right to wear a headscarf while in the

25 courthouse holding facility and in court during her afternoon hearing. On considering the state

26 of the law in the Ninth Circuit and others on this issue, it is evident that Plaintiff's right was not

27 "clearly established" when she was compelled to remove the scarf. In *Standing Deer v.*

28 *Carlson*, 831 F.2d 1525, 1528 (9th Cir. 1987), the Court upheld a "no-headwear" policy in a

1    dining area of a prison, finding it reasonably related to cleanliness, security and safety.  Other

2    circuits have also upheld decisions to prohibit inmates from wearing religious headgear.  *See e.g.*

3    *Young v. Lane*, 922 F.2d 370, 375-77 (7th Cir. 1991) (prohibition on yarmulkes outside of cell

4    justified by security concerns); *Benjamin v. Coughlin*, 905 F.2d 571, 578-79 (2d Cir. 1990)

5    (prohibition on wearing Rastifarian crowns while allowing yarmulkes and kufis justified by

6    "security concerns over concealing" weapons and contraband); *Rogers v. Scurr*, 676 F.2d 1211,

7    1216 (8th Cir. 1983) (upholding prohibition on wearing prayer caps and robes outside of

8    religious services).  These decisions demonstrate that, at the time of Plaintiff's interaction with

9    OCSD personnel, the right to wear religious headgear while in custody was not "clearly

10   established."

11       Consequently, defendants Carona and Cossairt are entitled to qualified immunity on

12   Plaintiff's First Amendment claim and Defendants' Motion to Dismiss Plaintiff's First

13   Amendment claim must be GRANTED as to these defendants.

14       **E.       California Constitution Article 1, Section 4**

15       Article 1, Section 4 of the California Constitution provides that, "[f]ree exercise and

16   enjoyment of religion without discrimination or preference are guaranteed."  Defendants do not

17   challenge the sufficiency of Plaintiff's allegations in stating a claim under this provision.

18   Instead, they claim that the provision is not "self executing" as to monetary damages in the

19   absence of an effectuating statute.  In other words, Defendants argue that a private plaintiff

20   cannot maintain a suit for damages under this section of the California Constitution.

21       The California Supreme Court has previously stated that many provisions of the

22   California Constitution are self executing to the extent that they "support[ ] an action, brought by

23   a private plaintiff against a proper defendant, for declaratory relief or for injunction."  *Katzberg*

24   *v. Regents of the University of California*, 29 Cal. 4th 300, 307 (2002).  Concerning monetary

25   relief, the California Supreme Court also laid out a framework for determining whether an action

26   for money damages would lie:

27           First, [the Court] shall inquire whether there is evidence from which
             we may find or infer, within the constitutional provision at issue, an
28           affirmative intent either to authorize or to withhold a damages action

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> to remedy a violation. In undertaking this inquiry we shall consider the language and history of the constitutional provision at issue, including whether it contains guidelines, mechanisms, or procedures implying a monetary remedy, as well as any pertinent common law history. If we find any such intent, we shall give it effect.
>
> Second, if no affirmative intent either to authorize or to withhold a damages remedy is found, we shall undertake the "constitutional tort" analysis adopted by *Bivens* and its progeny. Among the relevant factors in this analysis are whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision. If we find that these factors militate against recognizing the constitutional tort, our inquiry ends. If, however, we find that these factors favor recognizing a constitutional tort, we also shall consider the existence of any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages.

*Id.* at 317.    The California Courts have not yet addressed whether such a private suit for monetary damages is available under Article I, Section 4 of the California Constitution.  Thus, the Court is presented with a matter of first impression under California law.

However, 28 U.S.C. § 1367 gives this Court discretion to decline to exercise supplemental jurisdiction over a claim where that claim involves "novel or complex issues of state law."  28 U.S.C. § 1367(c)(1).  In addition to being a matter of first impression, and therefore novel, the determination of whether a private action for money damages exists also appears complex.  It would involve careful consideration of the intention of the state legislature, a delicate balancing of existing state law remedies, and consideration of the broader impact of such a constitutional tort.  The Court finds it prudent to abstain from considering this important issue of California law in favor of California courts.

Accordingly, the Court hereby GRANTS Defendants' Motion to Dismiss Plaintiff's claim under Article I, Section 4 of the California constitution without prejudice to allow Plaintiff to file suit in state court if she so desires.

### F.    Intentional Infliction of Emotional Distress

In order to plead a claim for intentional infliction of emotional distress under California law, the plaintiff must allege: "1) extreme and outrageous conduct by the defendant with the

1   intention of causing, or reckless disregard of the probability of causing emotional distress; 2) the

2   plaintiff's suffering severe or extreme emotional distress; and 3) actual and proximate causation

3   of the emotional distress by the defendant's outrageous conduct." *Christensen v. Superior*

4   *Court*, 54 Cal. 3d 868, 903 (1991) (citations omitted).  Because Plaintiff has pleaded facts

5   sufficient to establish such a claim, dismissal is unwarranted.

6          Outrageous conduct is that which is, "so extreme as to exceed all bounds of that usually

7   tolerated in a civilized community." *Id.*  Whether conduct could reasonably be deemed

8   outrageous is a question of law for the court. *Berkley v. Dowds*, 152 Cal. App. 4th 518, 534

9   (2007).  However, "if reasonable persons may differ, it is for the jury to determine whether the

10  conduct was, in fact, outrageous." *Id.*  In addition to being outrageous, the conduct must be

11  "intended to inflict injury or engaged in with the realization that injury will occur." *Davidson v.*

12  *City of Westminster*, 32 Cal. 3d 197, 210 (1982) (citing *Spackman v. Good*, 245 Cal. App. 2d

13  518 (1966)).  Plaintiff alleges that Defendant's conduct was "extreme, outrageous and

14  unprivileged. . .."  Specifically, she states that Defendants prohibited her from wearing her

15  headscarf despite knowledge that the headscarf was mandated by her religious beliefs.  She also

16  claims that, pursuant to an official custom, practice, or policy, OCSD officers, "intended to

17  cause or recklessly disregarded the probability of causing Plaintiff to suffer" harm.  Finally, she

18  alleges that Defendants should have known that prohibiting Plaintiff from using her hijab would

19  cause her extreme mental and emotional distress.  Reasonable people could certainly differ on

20  the question of whether this conduct was "extreme and outrageous."  Additionally, Plaintiff has

21  properly pleaded Defendants' intent to the extent possible.

22          Plaintiff's complaint also plainly indicates that Plaintiff suffered extreme mental and

23  emotional distress and that such distress was caused by Defendants' acts or omissions.  These

24  allegations are sufficient to establish the elements of harm and causation under the minimal

25  pleading requirements of Rule 8.

26          Accordingly, Defendant's Motion to Dismiss Plaintiff's Intentional Infliction of

27  Emotional Distress claim is hereby DENIED.

28

17

1       **G.**      **Statutory Immunity**

2        Defendants Carona and Cossairt claim that they are entitled to statutory immunity on two

3 bases: discretionary immunity under California Government Code § 820.2 and immunity from

4 vicarious liability under § 820.8. The County asserts derivative immunity under § 815.2.

5 California Government Code § 820.2 provides that, "a public employee is not liable for an injury

6 resulting from his act or omission where the act or omission was the result of the exercise of the

7 discretion vested in him, whether or not such discretion be abused." In determining whether

8 discretionary immunity is applicable, the Court "must consider whether the acts or omissions of

9 the particular employee resulted from the exercise of discretion within the meaning of section

10 820.2." *Barner v. Leeds*, 24 Cal. 4th 676, 684 (2000). This immunity is narrowly

11 circumscribed, and "is reserved for those basic policy decisions which have been expressly

12 committed to coordinate branches of government, and as to which judicial interference would

13 thus be unseemly." *Caldwell v. Montoya*, 10 Cal. 4th 972, 981 (1995) (citations omitted). A

14 determination of whether the alleged acts fall within this realm of basic policy decisions would

15 require the Court to inquire into the policy itself and the scope of the power vested in

16 Defendants. This would entail a venture far outside the confines of Plaintiff's complaint, which

17 cannot be undertaken on a Motion to Dismiss

18        Pursuant to Government Code § 820.8, "[e]xcept as otherwise provided by statute, a

19 public employee is not liable for an injury caused by the act or omission of another person."

20 However, the statute goes on to indicate that, "[n]othing in this section exonerates a public

21 employee for liability for injury proximately caused by his own negligent or wrongful act or

22 omission." Cal. Gov't Code § 820.8. Plaintiff alleges that Carona and Cossairt "directed" the

23 conduct in question. She also bases a claim on Carona and Cossairt's negligence in failing to

24 train, exercise control, or adequately supervise the officers who removed Plaintiff's head

25 covering. Because Plaintiff has sufficiently alleged that her injury was proximately caused by

26 the negligent or wrongful conduct of Carona and Cossairt, it is not evident that they are entitled

27 to § 820.8 immunity.

28        Finally, Government Code § 815.2 provides immunity to public entities for injuries,

18

1   "resulting from an act or omission of an employee . . . where the employee is immune from

2   liability."  Because the Court is unable to conclude that Carona or Cossairt are entitled to

3   statutory immunity, the derivative immunity defense of § 815.2 is inapplicable at present.

4   Accordingly, Defendants' Motion to Dismiss on the basis of statutory immunity under California

5   law is hereby DENIED.

6        **IV.    DISPOSITION**

7        For the reasons above, the Court hereby GRANTS Defendants' Motion to Dismiss

8   Plaintiff's equitable claims with prejudice.  The Court also hereby GRANTS Defendants'

9   Motion to Dismiss Plaintiff's RLUIPA claim with prejudice.  However, the Court hereby

10  DENIES Defendants' Motion to Dismiss Plaintiff's First Amendment claim against the County,

11  but GRANTS it with prejudice against Defendants Carona and Cossairt on the basis of qualified

12  immunity.  The Court hereby GRANTS Defendants' Motion to Dismiss Plaintiff's claims under

13  the California Constitution without prejudice to allow Plaintiff to reassert these claims in the

14  state courts.  Finally, the Court hereby DENIES Defendants' Motion to Dismiss Plaintiff's claim

15  for Intentional Infliction of Emotional Distress.

16

17

18

19  IT IS SO ORDERED.

20  DATED:  March 26, 2008

21

22  _____

23                    DAVID O. CARTER
                United States District Judge

24

25

26

27

28

19